Albert FADEM, Stephen Z. Fadem, Lloyd R. Fadem, Bruce Fadem, Margaruite Mandell, Cheryl Lynn Kaplan, Beth Ann Mandell, and Marc Allen Mandell, Appellants,

v.

Irvin R. KIMBALL and Esther J. Kimball, Appellees.

No. 51538.

Court of Appeals of Oklahoma, Division No. 1.

July 10, 1979.

Rehearing Denied Aug. 7, 1979.

Certiorari Granted as Modified by the Supreme Court March 11, 1980.

Rehearing Denied by Supreme Court April 28, 1980.

Approved for Publication by Supreme Court May 1, 1980.

Loeffler & Allen, Bristow, for appellants.

Tom J. Ruble, Taloga, for appellees.

BOX, Judge:

An appeal from the judgment of the trial court in favor of the appellees, Irvin R. Kimball and Esther J. Kimball, in a quiet title action. As the parties did in their briefs, we will refer to the appellants as "the Fadems" and to the appellees as the "the Kimballs."

The land involved in this appeal is part of a tract owned by the Fadems, located in Dewey County just northeast of Taloga. The Fadems are the record owners of Lots 1, 2, 3, and 4, and the NW ¼ of the SE ¼, of Section 8, T. 18 N., R. 16 W.I.M. The Kimballs own the adjoining land to the north, including the S ½ of Section 5, the NE ¼ of the NW ¼ of Section 8, and the W ½ of the NW ¼ of Section 8. The following sketch, with the Fadems' property shaded, depicts the land involved:

Left river bank in 1874
South Canadian River
Lot 1
Lot 2
Lot 8
Lot 3
Fence
South Canadian River
Lot 4
Left river bank in 1874
Fence

Our concern is with the three small triangular portions of the Fadems' land lying north of the fence in Lot 1, Lot 2, and the NW ¼ of the SE ¼. These three tracts comprise approximately 30 acres.

This controversy began in 1974, when an owner of land south of the South Canadian River filed a quiet title action naming the Kimballs and the Fadems as co-defendants. Both parties cross-petitioned and asked that title to Lots 1, 2, 3, and 4 and the NW ¼ of the SE ¼ of Section 8 be quieted in them, the Kimballs asking by virtue of adverse possession. All of the other issues in the original action have been adjudicated or settled, and only the controversy between the Kimballs and the Fadems remains.

This matter was tried to the court in April 1977. The only witnesses were Irvin Kimball for the appellees and Albert Fadem for the appellants. All other evidence was admitted by stipulation, and none of the matters testified to were contradicted by the opposing side. At the trial Irvin Kimball testified that since 1945 he had run cattle on his land and down to the river. For some time prior to 1954, the land south of him was owned by Mr. and Mrs. A. S. Berry. In 1954 the Fadems acquired the surface and an undivided one half of the minerals from the Berrys, who reserved the other undivided one half of the minerals. Albert Fadem, who lives in Tulsa, testified that he had never been on the land, but that Mr. Berry, who also lives in Tulsa, had visited it. He testified that the Fadems had never used, leased, or attempted to lease their land, but that all they had ever done with it was to execute several oil and gas leases covering it and pay the taxes on it each year. On direct examination he testified that he had never given anyone permission to come on the land. On re-direct examination he testified that the Fadems made some inquiries about the land, and in February 1959 they were advised by letter that someone may be using the land for pasture. However, the Fadems did not pursue their inquiries.

In the summer of 1958 Irvin Kimball built the fence that appears in the sketch above. Since that time he has continued to pasture cattle on the enclosed land. At trial the Kimballs limited their claim of title by adverse possession to the three small tracts of the Fadems' land lying north of the fence. They asked that title be quieted in them to the surface and an undivided one half of the minerals, making no claim to the minerals reserved by the Berrys in 1954. The trial court held that the Kimballs "sustained their burden of proof of establishing their adverse possession," and quieted title in them. The Fadems have perfected this appeal.

*The Surface Estate*

■ In order to establish adverse possession, it must be shown that the possession was hostile, under claim of right or color of title, actual, open, notorious, exclusive, continuous, and for the statutory period of time. Inherent in the trial court's judgment is a finding of all of these elements. The Fadems, however, contend that several elements are lacking.

■ The Fadems first contend that the possession of the Kimballs was not hostile to the Fadems' rights. In support of this contention they refer us to the following language in *Winslow v. Watts*, Okl., 446 P.2d 598, 600:

> "Mere naked possession or occupancy of premises, no matter how long, without a claim of right or color of title, cannot ripen into a good title, but must always be regarded as being an occupancy for the use and benefit of the true owner. To constitute the basis for adverse possession, the entry upon the property must be accompanied by a claim of right, or after entry, there must be a distinct denial or repudiation of the right of the true owner, or the possession will be deemed to be held in subordination to the rights of the owner." [Quoting *Cook v. Craft*, 207 Okl. 125, 248 P.2d 236, 237 (per curiam) (syllabus ¶ 3).]

The Fadems assert that the Kimballs never denied or repudiated the Fadems' ownership; therefore, the possession was not hostile. We decline to follow this argument for three reasons. First, in the *Winslow* case the Supreme Court merely used the above language in setting forth the defendant's argument; the Court there held for the plaintiff, the adverse possessor, on facts similar to the case now before us. Second, the language quoted above comes from a line of cases in which the relationship between the person claiming by adverse possession and the true owner was such that— *as a matter of law*—the claimant's possession could not be adverse absent some ouster, denial, or repudiation. See, *e. g., Morris v. Futischa*, 194 Okl. 224, 148 P.2d 986, 987 (possession by tenant in common); *Cook v.* *Craft*, 207 Okl. 125, 248 P.2d 236, 238 (per curiam) (possession by administratrix); *Copenhaver v. Copenhaver*, Okl., 317 P.2d 756, 759 (possession by life tenant); *Chapman v. Tiger*, Okl., 356 P.2d 571, 579–80 (possession by tenant renting the property); *Independent School District No. 40 v. Allen*, Okl., 446 P.2d 282, 286 (possession under permissive use). In the case before us no such relationship existed. We are unaware of any Oklahoma case requiring an affirmatively communicated denial or repudiation of the right of the true owner when the possession did not begin as rightful or permissive. Finally, if there were such a requirement, we would find it satisfied by the Kimballs' acts of dominion over the property in fencing and using the property without permission or privilege to do so. *See Kouri v. Burnett*, Okl., 415 P.2d 963, 968.

■ In further support of their contention that the Kimballs' possession lacked the attributes of hostility, the Fadems point out Mr. Kimball's reason for building the fence was to keep his cattle from straying down to the river. While this was his testimony, he also related that at the time he built the fence he "claimed" as his own all the land up to the fence line. The record is thus clear that the fence was meant to serve both as a boundary line and a barrier to contain cattle. Its dual purpose is not at all inconsistent with the adverse character of possession.

■ The Fadems next contend that the possession of the Kimballs was not under a claim of right, because they were never put on notice of an adverse claim by the Kimballs. However, the letter of February 1959 should have put them on inquiry that someone was using the land, and in any event they did have constructive notice. In the first paragraph of the syllabus in *Winslow v. Watts*, 446 P.2d at 598–99, the Supreme Court held:

> Acts of such character and so definite and observable that they would reasonably indicate to an owner of ordinary prudence, should he visit the premises, that ownership adverse to him is being asserted, or sufficient to put him on in-

quiry, constitute constructive notice of adverse possession.

When possession having the requisite character of being "actual, open, notorious, exclusive and hostile" has extended for fifteen years, the occupant's "claim of ownership" is complete. In fact, occupancy of that character and length constitutes a "claim of ownership" or is deemed to be "under claim of right" and *nothing additional is necessary for its perfection.* 60 O.S.1971 § 333.

The record supports Kimballs' argument of possession that was openly and peacefully hostile to true title (in the sense of being nonpermissive). No more is necessary as a basis for a "claim of right". In *Caywood v. January*, 455 P.2d 49, the Supreme Court stated:

Claim of right means the intention of the disseizor to appropriate and use the land as his own to the exclusion of all others, irrespective of any actual title or right, and it has been said that if the claim is hostile it is "under a claim of right."

We hold that the Kimballs' possession was under a claim of right.

■ The Fadems next contend that the possession of the Kimballs was not exclusive. They rely on the fact that other people's cattle sometimes get onto the fenced-in land. However, Mr. Kimball testified that he has a corral in Section 5, and when cattle stray anywhere onto his land he corrals them and calls the owner to come get them. In the second paragraph of the syllabus in *Stern v. Franklin*, 288 P.2d 412, 413 (per curiam), the Supreme Court held:

Where one claiming title to a tract of land and he and his licensee owned land bordering onto said tract, and fenced such land bordering onto said tract, but said land was open on the other three sides, his possession of the tract was not interrupted by the fact that cattle belonging to other persons, occasionally strayed onto the tract, since the cattle were not placed there by others, under a claim of right.

We therefore hold that the Kimballs' possession was exclusive.

■ The Fadems next contend that the possession of the Kimballs was not continuous. The Kimballs owned or had under lease some 1800 acres, 540 of which—located away from the land in question—was under cultivation. Mr. Kimball testified that the number of cattle pastured would vary from as few as 50 to as many as 400. During the winter he would feed the cattle on the pasture that included the disputed tracts. They would stay close to where he fed them, but would not venture south onto one of the tracts in dispute. The Fadems assert that this was not a "continuous" use. We disagree. What is most important is that the Kimballs did use the land, not how intensively they used it. We find that sometimes reducing the herd size and feeding in the winter on some other part of the same pasture did not break the continuity of the Kimballs' possession. Accordingly, we hold that the Kimballs' possession was continuous.

■ The Fadems advance two more arguments for reversal. First, they point out that they paid the ad valorem taxes on the disputed land during the entire period they have held title to it. While it is always admissible, the payment of taxes is not dispositive in an adverse possession controversy; rather, it is one factor to be considered. *E. g., Sears v. State and Department of Wildlife Conservation*, Okl., 549 P.2d 1211, 1213. We do not find it persuasive in this case. Second, the Fadems point out that the Kimballs offered no evidence to verify that the fence was built in 1958. While it would help, it is not required that the Kimballs' evidence be corroborated. What is required is that proof of the constituent elements of adverse possession be clear and positive. Any inferences or presumptions that must be made in order to fill gaps in the proof must be made in favor of the true, or record, owners. *E. g., Sears v. State and Department of Wildlife Conservation*, 549 P.2d at 1214. From our review of the record, we find the judgment of the trial court, that the Kimballs sustained their burden of proof of adverse possession,

to be free of error and supported by the evidence.

This disposes of the issues relating to title to the surface. On purely legal grounds, the Fadems raise other arguments regarding the mineral interest.

### The Mineral Estate

■ The trial court quieted title in the Kimballs to the surface and an undivided one half of the minerals of the three tracts of land in dispute. On appeal the Fadems urge that even if the Kimballs obtained title to the surface by adverse possession, the Kimballs' possession should not ripen into title to their mineral interest as well. They urge this position because their undivided one-half interest in the minerals was, they allege, severed from the surface interest. In Oklahoma, and other states as well, the rule is this:

> Where there has been a severance of the legal interest in the minerals from the ownership of the land, adverse possession of the surface is not adverse possession of the mineral estate.

*Deruy v. Noah*, 199 Okl. 230, 185 P.2d 189, 189 (syllabus ¶ 2).

■ In this case the Berrys reserved an undivided one half of the minerals when they conveyed the property to the Fadems in 1954. The Fadems later executed three oil and gas leases covering the property: one in October 1961 (which expired in 1971), one in October 1971 (which was released in February 1974), and one in August 1974, after this action was filed (which is still in effect). If there was a severance of the minerals prior to the time the Kimballs' period of adverse possession began (which the trial court held to be 1958), it could only have been effected by the 1954 conveyance.

Our first question, then, is how much of the minerals the 1954 conveyance severed. There is no Oklahoma authority on this point, but courts that have ruled on the point hold that only the portion of the mineral interest conveyed or reserved is severed. In *Johnson v. Gray*, 75 N.M. 726, 729, 410 P.2d 948, 950 (1966), we find this language:

We think it is clear that a conveyance or reservation of a fractional interest in the minerals by the owner of a fee simple estate will only effect a severance of the fractional interest so conveyed or reserved. *Dixon v. Henderson*, 267 S.W.2d 869 (Tex.Civ.App.); *Thomas v. Southwestern Settlement & Develop. Co.*, 132 Tex. 413, 123 S.W.2d 290, 291, 300; *Henderson v. Chesley*, [229 S.W. 573 (Tex.Civ. App.)] supra. And, see *Gulf Refining Co. v. Orr*, 207 La. 915, 22 So.2d 269, and discussion notes 1 Oil & Gas Reporter 447, 449, by the editors of Southwestern Legal Foundation.

Under this rule, only the Berrys' reserved one-half interest was severed; the Fadems' was not. We think that this is the proper rule. The Berrys had no interest in the surface; thus, possession of the surface was of no concern to them, and their mineral interest should be considered severed. But the Fadems owned the surface as well as one half of the minerals; the surface conditions did concern them, and there are no attributes to their ownership of an estate in the minerals that should cause their mineral interest to be considered severed. We hold that the 1954 conveyance did not sever the Fadems' undivided one half of the minerals.

■ If the Fadems' one half of the minerals were ever severed, then, they were severed by the execution of either the 1961 or the 1971 oil and gas leases. (The 15-year statutory period had run before the 1974 lease.) The issue of whether an oil and gas lease effects a severance of the minerals has not been decided by our Supreme Court, and we find it unnecessary to decide the issue in this case. *See generally* 1 E. Kuntz, *The Law of Oil and Gas* § 10.4, at 224–25. Even if the leases are considered to have effected a severance, we would be faced with the question of whether a severance after the beginning of the period of adverse possession interrupts the possession. The authorities are in agreement that it does not. In 1 H. Williams & C. Meyers, *Oil and Gas Law* § 224.1, at 347–49, we find the following statement of the rule, on which the trial court relied:

Severance of minerals by the lawful owner after adverse entry but prior to completion of the limitation period does not interrupt the running of the statute either as to surface or minerals. While this rule seems to conflict with the notion that an adverse possessor is a mere trespasser, with no interest in the land until the full limitation period has run, it is explained on the ground that severance is not an ouster of the adverse occupant. The result is justified under the notice rationale, since the grantee of the minerals is charged with notice of the status of the land at the time of taking his grant. It is only of surface conditions arising after severance that he has no notice. [Footnotes omitted.]

And in 1 E. Kuntz, *The Law of Oil and Gas* § 10.2, at 211–12, we find this language:

After adverse possession has begun as to the surface and minerals, a subsequent conveyance of the minerals, or grant of an oil and gas lease by the owner out of possession before the running of the statute, unaccompanied by suit or ouster, will not disturb or interrupt the adverse possession. This result may be explained upon the basis that the deed or lease by one out of possession is champertous and void as to third persons, or it may be explained on the basis that the constructive possession of the true owner had ceased and that the delivery or recording of a conveyance is no disseisin and is no actual interruption of adverse possession. Whatever the explanation, it is clear that the mere shuffling of papers by the execution or delivery of instruments by one out of possession will not serve to interrupt adverse possession which has already begun. [Footnotes omitted.]

We hold that a severance of the minerals after the beginning of the period of adverse possession, absent some ouster, does not interrupt the adverse possession.

There was no severance of the Fadems' undivided one half of the minerals in 1954, and the statutory period for adverse possession began to run in 1958. Fifteen years elapsed in 1973, and at that time the Kim-balls gained title to the Fadems' surface and mineral estate by adverse possession. The Kimballs' adverse possession was not affected by the 1961 and 1971 oil and gas leases executed by the Fadems, either for the reason that they did not effect a severance or, if they did, because a severance after the beginning of the adverse possession does not, absent some ouster, interrupt the running of the period. Accordingly, we find that the judgment of the trial court is correct, both as to the surface and the undivided one half of the minerals, and it is hereby affirmed.

AFFIRMED.

ROMANG, P. J., concurring.

REYNOLDS, J., concurs in results.